We will hear argument first in No. 151313 ASP Denver v. GSA. Mr. Sweeney. May it please the Court. The Board rejected ASP's tax claim on the factual finding that ASP and GSA never negotiated the base year tax rate. That finding is not supported by substantial evidence. Never, I'm sorry, never agreed on the base year tax rate. There was discussion about it. I believe that the Never negotiated it to an agreement. No, I believe the Board found that there was not a negotiation of the base year tax rate. I'm just trying to get the language straight. A rate or a number was not agreed upon by the parties. It was a subject of discussion, but it was not. They did not reach an agreement. No. That's what the Board found. Your position is that they did. Yes, but the Board also found that there was not a negotiation. There was not a negotiation or an agreement. The Board did not find that there was a negotiation, but that they failed to reach an agreement. The Board found that there was not a negotiation of the base year tax rate. Under the contract, if they had discussed it but not reached an agreement, you would be in the same position, wouldn't you? They either agreed to it or they agreed that whatever was going to come out of the first full year tax assessment was going to be it. Your position as the former and the government's position and the Board's finding was the latter. Our position is we did negotiate it and we reached an agreement. That position, in addition to being supported by the terms of the lease, including the best and final offer by ASP, which in turn incorporated the contracting officer's letter that solicited the best and final offer, confirmed that there was not only negotiations but there was an agreement. The agreement is further confirmed by the testimony of the contracting officer at the hearing. He specifically testified that the party did negotiate and did agree to a base year tax rate, but he claimed and GSA argues that it was limited to one year. There is no such provision reflected in the lease or reflected in any of the standard clauses or the regulations that contemplate a one-year negotiation of the base year lease rate. His testimony, I guess, was that it was a placeholder pending the first year, if I recall, his ultimate explanation. That is his testimony, but that is not what is reflected in the lease. And again, the lease including all the incorporated terms and particularly the best and final offer. They argue and they also argue that he was interpreting the tax adjustment clause when he made that testimony. But as His Honor referred to, either they negotiated and agreed or they didn't. The contracting officer agreed that, testified they did negotiate and reach an agreement. Section 4.4 of the SFO has two things. You either agree on a tax rate or it's established by the first year valuation. I'm sorry, go ahead.  Why doesn't the paragraph 12 of the Standard Form 2 answer the question of which of those two choices was elected? Because that Standard Form 12 needs to be read in the context, first of all, in which it was prepared, as well as part of reading the lease as a whole and trying to give meaning to all those terms. One of the fundamental problems with the – Standard Form 2, paragraph 12, refers us to the provision that says there are two different ways, as I understand it, to determine the starting point for the tax rate, right? You can either agree on something that will be the starting point or you can go with the first full year. Those are the two choices. Standard Form 2, paragraph 12, seems to say that it is the first full year of those two options that is the one that was chosen. As I read this language, it looks pretty unambiguous. Is there something about this language that should lead me to think that it isn't as clear as it looks on its face? Yes, several things, Your Honor. First of all, the lease is not Standard Form 2. Standard Form 2 is part of the lease. Standard Form 2 expressly incorporates as part of the lease the best and final offer, which in turn has the contracting officer's letter incorporated and attached to it, that reflects as a result of our negotiations, that's the contracting officer's letter, he recites a number of things that have been negotiated, including the basic tax rate of $3.88. So that provision, the terms of the best and final offer, have as much standing in the lease as does any provision in Standard Form 2. Another important thing to understand is reading the Board's decision, the Board fundamentally misunderstood what Standard Form 2 was in terms of its nature, its timing, and its purpose. The Board found that Standard Form 2 was to solicit an estimate from ASP for taxes. That was not the purpose of it. Standard Form 2 was drafted after the fact, after the submission of the best and final offer, after the close of negotiations, and after the award of the lease to ASP. And the realty specialist for GSA who drafted Standard Form 2 specifically testified that its purpose, it was not to solicit anything, there was no more feedback from ASP, it was strictly to memorialize what had previously been agreed to. And what had previously been agreed to is reflected in the best and final offer, which in turn is incorporated in the lease. So are you saying that paragraph 12 then is erroneous? I'm saying the manner in which GSA interprets it makes it erroneous. What's an interpretation of that, just the text of that paragraph, that is consistent with your position? One, it quotes back the precise figure of $3.88 per month. So is it an estimated annual tax base, just estimated? Correct. And then it says, or immediately before that, it says that in accordance with paragraph 4.4, which is the one that creates the two options, that the first option, that is to say the first full base year of assessment, will be the binding one. What's the interpretation of that language that is in your favor? Well, first of all, again, the three options. I know you say that, well, there are other things that lead one to think that that can't be the real rule, but is there anything in that paragraph that I can look to and say, here's the ambiguity or here's the way to read this that favors you? Well, what is referred to as, what is tracked in terms of purporting to be from section 4.4 is not. It's a different language than is used in 4.4. 4.4 refers to the first full calendar year as opposed to the first 12 months, which is used in 4.4. But again, paragraph 12 is not the entire lease or the terms relating. The ambiguity and the conflict, well, first of all, it should be and can be read consistent throughout the balance of the terms of the lease. And if it's not, it creates a conflict and an ambiguity with the best and final offer. That ambiguity is as a result of Standard Form 2 that was drafted unilaterally by GSA and in the context of the whole lease and when it was reviewed and executed by ASP, there was no evident conflict there. They understood it to be completely consistent with their best and final offer, quoting $3.88 as the base tax rate. So if they did see any sort of confusion or read this in a way that was inconsistent with their best and final offer, they would have indicated as much? I mean, wouldn't you have, before you'd sign something like Standard Form 2, wouldn't you have a duty to read it and make sure that you thought that it indicated the final agreement between the parties and what was negotiated? Absolutely, Your Honor. And ASP specifically testified that they read it consistent with everything, with all the other terms and never realized nor was there any alert provided until the tax bill that we submitted was rejected. The point is that— We have a hard time with it because it says the base year of taxes shall be the first calendar year of full assessment and will be set in accordance with Paragraph 4.4. It seems pretty clear. It shall be. Respectfully, that's not inconsistent with what we understood it to be, that the first 12 months would— that is when the agreement relative to the base year would go into effect once the property was actually assessed. You're into your rebuttal time. If you want to take one minute to say something about the HVAC or you can leave it to the briefs, it's up to you. With respect to the HVAC, again, two things. One, the solicitation initially only requested one overtime rate. The solicitation was then amended to add 8.3b, which was a second form of overtime and the only way that you can get compensated for HVAC overtime. The solicitation instruction to bidders was never amended. It only required one overtime rate. We provided one overtime rate. The contracting officer confirmed that singular overtime rate in his letter soliciting the best and final offer, and the contract does not provide two definitions of overtime, but the board applied two different definitions. In terms of the GSA's understanding, the present value analysis by the GSA demonstrate that GSA understood completely that the $3.88 was submitted pursuant to 8.3b because GSA used that precise—I'm sorry. Not $3.88. You're talking about— The hourly rental rates, thank you, were submitted pursuant to 8.3b because those are precisely the rates that GSA used to conduct the present value analysis and the present value analysis per the lease only related to 8.3b, not 8.4. Thank you. Thank you, Your Honor. Please, the court. The court should affirm the board's denial of ASP Denver's real estate tax and on-demand 24-7 HVAC claim because both claims are defeated by the lease's plain terms and are supported by substantial evidence. The lease states that the real estate tax base is the taxes for the first calendar year of full assessment, not a separately negotiated and agreed upon rate, as ASP Denver argues. Is that different from the language of 4.4 itself, which is not the first full calendar year? Section 4.4 refers to the first 12 months, and the standard form 2, which is at J-74, talks about the first calendar year. I'm sorry, the first full calendar year. Right. Are those— Calendar year of full assessment. Are those different or are those the same? We believe they're the same because I don't think there's any dispute that the first 12 months of full assessment was the calendar year 2010, January 2010 through December 2010. So we don't think there's any dispute. So the assessment was done on a calendar year basis? Yes. Invariably in this setting? Yes, and that is typically based on our understanding how real estate tax assessments are done. Okay, and can I ask you what role, if any, is played by the sentence in J-74? This is standard form 2, paragraph 12, the sentence just before the one that you've rightly been focusing on, the one that says the estimated annual tax base is 679. Is that doing any work at all? The rest is— In case you want to know. Well, the role that it plays is that in the offer, the offeror needs to, as the contracting officer testified, needs to have a placeholder for what it expects the real estate taxes to be. And so the GSA needs to have a way to evaluate the offers. And so in the lease it states, and this is based on ASP Denver's offer, that the estimated annual real estate tax bases are $3.88 per square foot. And the estimated language is important because in a case that the board cited and that we cited in our briefing, which is a board case by the name of 6NE Associates LLC, the board interpreted an identical lease provision here and stated that the fact that the lease said estimated meant that it was not an agreed upon real estate tax base. But again, it was simply a placeholder that was based on ASP Denver's offer. But you say the importance of putting it into, in this case, Standard Form 2, is because it tells the GSA something about the value of the offer. Is that the idea? Yes. There needs to be a way to— Because depending on what the number is, it changes the risk that the government will be on the hook for a larger or smaller amount of additional tax in the future. Yes, exactly. And the $3.88 per square foot is a part of the $35 per square foot rate that ASP Denver proposed. So it's actually a part of the offer, and GSA needed to evaluate what their estimate was for the real estate tax base. Just to be clear, when was this document, Standard Form 2, prepared? After—I think your friend on the other side said this was prepared after their offer was accepted. This—it was prepared after their best and final offer. It was not prepared after the offer was accepted. I mean, this is the lease, so this is when the offer was accepted. I guess that I have what I think is the same question as the presiding judge, which is what role—given that it was very late in the process that this came in, this Standard Form 2 came into play, what role at that point did it have? Was GSA still evaluating offers at that point, or was this just memorializing something that had previously been submitted as part of an offer and not having any further operative effect on the agreement? I think it does have an operative effect on the agreement. Okay, what's the operative effect of that 388 on the agreement? On the specific— On the ultimate agreement. It memorializes the agreement. But only memorializes something that happened before, but is no longer pertinent to the obligations of the parties, as I understand it. Is that right?  How would it affect the obligations of the parties? Well, it clarifies that the parties did not negotiate and separately agree upon a real estate tax base, and the suggestion by counsel for ASP that this was somehow inserted into the lease or unilaterally drafted, it's signed by ASP Denver. They read this provision and agreed to it,  There's nothing in ASP Denver's offer, there's nothing in the correspondence that supports ASP Denver's suggestion that the parties separately negotiated and agreed upon a real estate tax base. It's just not there. Can you explain what all of the occupancy agreements are doing and saying page after page after page the rate for the real estate taxes is 388? Yes, the occupancy agreements were prepared by GSA and at their consultation with the FBI, and they're not probative of, obviously, the meaning of the lease. These are extrinsic evidence, most of which were prepared, I believe, before the lease was signed. And as Ms. Boland testified— Yes, some of them. I think the last one does. But most of them, I believe, were prepared before the parties signed the lease. But importantly, the effect of these occupancy agreements, as Ms. Boland testified, and this is at the record of JA1105.5, that all the occupancy agreements show is the breakdown of the rental rate from ASP Denver's SF2. So ASP Denver proposes a rental rate of $35 per square foot, and it's broken down for utilities and several other components, one of which is the $3.88 per square foot. So all that is is simply taking ASP Denver's offer, which was incorporated in the lease, and basically ticking down the components of their offer. It never says in any of these occupancy agreements that the parties separately negotiated and agreed upon a real estate tax base. And it furthermore cannot overcome, again, the SF2 and the plain language of the lease. But why isn't it indicative, or to use your word, probative, of a government understanding that the rate, until changed, built into the payments that ASP had to make to GSA, and therefore GSA had to, I guess, ASP received from GSA, and then GSA was going to receive from FBI, was $3.88, including saying this repeatedly after the first year assessment. It certainly is probative before the first year of full assessment, because, again, as the contracting officer testified, GSA needs to have a placeholder for what the offeror expects the real estate taxes to be. So here, the only— So the government expected this number, and when it turned out that they were mistaken in estimating the tax rate and you were also mistaken in estimating, you got the benefit of that. They had to eat it. Yes, and I think it's important to understand why the real estate tax base was misestimated. They forgot one of the two taxing authorities, right? Yes. And therefore missed it by about half. They did, but it's also important to understand that had they used the correct mill rate and properly estimated the real estate tax base, they may not have been the successful offeror. So essentially what ASP Devers is asking the court to do is to— Well, they might have decided that the deal wasn't worth it if they had to keep paying this. They might have been happy not to have been the successful offeror, or if it meant losing all this money. We don't know that. That's certainly a possibility. But, again, this is a fixed-price lease, and the burden upon ferreting out what the correct mill rate and what the correct estimated real estate tax base is supposed to be is on the professional commercial real estate developer, ASP Denver. It's not incumbent upon GSA to go behind ASP Denver's estimated real estate tax base and inform them that they were wrong. So that's not GSA's responsibility on the lease, and the board correctly noted that in its decision. And as far as the reference to— ASP Denver's counsel says there's a lack of substantial evidence to support the board's finding that there was not an agreed-upon real estate tax base rate, and that's simply not the case. Ms. Boland testified, who is the GSA realty specialist that actually conducted negotiations, that the parties never agreed to a real estate tax base. And Your Honor's question regarding the difference between negotiation and agreement is important here because ASP Denver never points to anything in the record that says there was an agreement between the parties for $3.88 real estate tax base. And it's further supported by the price memorandum negotiation that's in the record at J855 to J856 that recounts what the parties negotiated about. There's never any reference to a negotiation or an agreement on a real estate tax base. That's further substantial evidence. I'm confused now about whether we're drawing a distinction between negotiation over a real estate tax base versus negotiation over an estimated real estate tax. Are you saying that, well, they did negotiate it over the estimate, but they didn't negotiate it over the final base, i.e., the rate that would be binding? Or are you saying they didn't negotiate it over even? They didn't. There's nothing in the record to indicate that there was any separate negotiation about the real estate tax base. ASP Denver cites one letter in the record. Well, how about the testimony that ASP has pointed us to that by—I've forgotten his name. Mr. Pierce. Mr. Pierce, that's right. What about that testimony? He testified that the $3.88 estimated tax base was a placeholder, and that's exactly— Right, right, but was he testifying that that was negotiated? No, that was not separately negotiated. He testified, and there's—admittedly, ASP Denver cites a portion where he suggests maybe that there is some negotiation, but there's other testimony in the record where Mr. Pierce says that $3.88 per square foot is not their base year taxes and that the base year real estate taxes would be established after one year of full assessment, which, again, is exactly what the lease says, and that's at JA 1074. So he testifies, as I see it, about 949 to 950. The base tax rate that GSA negotiated with ASP was good for one year. Negotiated, and he says yes. Yes. So is he testifying—it sounds to my ear that he is testifying that there was negotiation. Yes, that is testimony— That was being negotiated. An estimated rate? There was no—again, Mr. Pierce did not conduct the negotiations. Well, then what is he talking about here when he says negotiated? This is a negotiated procurement, so— Yeah, but they're talking specifically about the base tax rate that GSA negotiated with ASP. Are you saying that he simply was wrong in that testimony? No, what the testimony says— Then what does that testimony mean? Just that the real estate tax base that he's referring to is, again, a placeholder for what the taxes end up going to be, and this is confirmed by the magnitudes. So he did negotiate for something, but he negotiated for a placeholder? Is that what you're saying? There was overall negotiations. Again, it was a negotiated procurement, but there was not a separate negotiation regarding the real estate tax base, and that's confirmed by the testimony of Ms. Boland that's in the record and the price negotiation memorandum that's also in the record, and it's confirmed also by the plain language of the lease. Well, I understand what you're saying, but I'm just—I'm left with the feeling that what you're saying is not consistent with the answer he gave to the question that appears at the top of J8950. Now, maybe your position is that he was simply mistaken and gave an imprecise answer. I think it's fair to say that it was imprecise, but later on in his testimony, he clarified that there was no separate negotiation about the real estate tax base. So we would ask the court to affirm— Can you say a word about the HVAC classes? Sure. Is it your view that the calculation of an amount, a lump sum amount—this is 8.3B— to be paid for the 24-hour HVAC service was part of the lease payment or over and above the lease payment, the rental payment? It's both. A portion of the 24-7 HVAC was a part of the lease rate, and that's confirmed by the FBI's program of requirements. So the 24-7 system is a dedicated system, but it's broken down into two modes. One is a dedicated mode, so that's essentially on and off. It's always on, or somebody can walk into a room and say, I want it on. Exactly. And the other portion is the on-demand portion. So this only operates if someone essentially pushes a button. Right. So the dedicated portion of the 24-7 system is included in the lease rate of $35 per square foot. The 24-7 on-demand is not. And the GSA allowed ASP Denver or any of the offerors to propose a cost for those services. ASP Denver did not propose a cost for that. They proposed a cost that would be over and above the $35 per square foot lease payment, and then say, here's, it amounts to, I don't know, $120,000. Here's an invoice for that, and pay us this in addition. Yes, and it's no surprise that ASP Denver did not propose a cost, because, again, even though they claimed $900,000 for these services, the actual cost of the services was less than $25,000. And this is a $120 million lease. So you're saying that they just sort of threw this in as just essentially a free item. Yes, it's essentially a de minimis cost. $20,000 per year is de minimis when you're talking about a $120 million lease. And their claim for these services for the 24-7 on-demand room, which is less than 25% of the building, is double the utilities for the entire building. So ASP Denver's effort to misread the lease here asked the board and asked the court to provide them with a significant windfall. And for those reasons, we would ask that the court affirm the board's denial of the real estate tax claim and the 24-7 on-demand claim. Thank you. Five minutes total. Thanks. Thank you, Your Honor. A few things briefly. First of all, Mr. Pierce is the contracting officer. Mr. Pierce is the person that signed the November 8, 2007 letter that solicited the best and final offer and confirmed the negotiations of multiple terms, including the tax rate and a singular HVAC rate. He also signed the lease. Mr. Pierce's testimony was not imprecise with respect to the negotiation and agreement on the tax rate. It's very specific. The court has the citations correctly to the record. With respect to 6 and 8— How do you respond to the comment that that's clarified at JA 1075 and that there, Mr. Pierce says that it's just a placeholder, just an estimated cost? Basically, that was backtracking, and it's inconsistent with the lease. That explanation of, oh, we negotiated the tax rate but that it was just for one year, a one-off thing, the only place that that is found is in redirect testimony by the contracting officer, and it's not found in the lease. It's not in the regulations. It's not in standard form 4.4, which, again, has two options. You negotiate it or it's set automatically. Not you negotiate it for a year and then later on you do something else. So I think if you read his testimony, it's nothing more than his argument and interpretation of the lease and now standard form 2, and to the extent that's his position, it's completely inconsistent with the lease and the regulations and the standard forms. With respect to the HVAC claim and the costs versus the charges, the contracting officer specifically testified that 8.3b was added by addendum to the solicitation. That's also part of the record. It's indicated there specifically. For the express purpose of providing offerors the opportunity to receive compensation, additional compensation over and above the $35 per square foot cap on the rental rate. ASP did precisely that. The evidence demonstrates that in financing the project, ASP relied upon the additional payments under 8.3b. And I'd also point out if just reading 8.3b on its face, it does not say it provides a very precise formula. We will take 6,250 hours of possible 24-hour on-demand overtime. We're going to multiply that by the overhead rate you quote, and you will receive a lump sum payment every year for that. It's easy math. And it's also important to note that that math, once again, is reflected in the GSA's own documents, where they make precisely the calculation reflected in 8.3b in their present value analysis, which was only limited to 8.3b. They use the same 6,250 hours quoted in 8.3b. They use precisely the overhead rates provided by ASP. Briefly, with respect to 6,250 hours. Can I just ask, does the apparent very large dollar figure disparity between costs to you and using the formula as you've just described weigh against interpreting the provision in the way that you suggest? No, it doesn't. Why is that? First of all, do you agree that these two numbers are way out of whack with each other? If you were to isolate it and just look at utility costs, yes. But let me point out there's also the capital costs of putting the system in in the first place. But in any event, it's not inconsistent because, again, the express purpose or the stated purpose of 8.3b was so the offerors and ultimately ASP could get more money than the $35 rental cap. So that, in essence, GSA could get more bang for its buck. And it got it. So there's not a windfall here. If you look at it outside the context of 8.3b, which does not say we'll reimburse your cost, it says you'll be paid your rate times 6,250 hours. There is no windfall in the context of the lease. On the contrary, there is a tremendous adverse impact to ASP and GSA essentially got about $20 million of scope in that project for free because of its failure to pay per 8.3b. The only thing I'd point out is with respect to 6 and E associates, it has no application to this case. There was no negotiations whatsoever. And as compared to the best and final offer and the contracting officer's letter confirming the negotiations, which was incorporated into the best and final offer and incorporated into the lease. To the extent the details of these two issues are tedious and confusing and mind-numbing, I would suggest and point out that that is the fault and the responsibility for the GSA. It arises only from the two paragraphs. You need to wrap up. You've gone over your time. Thank you. Case is submitted.